[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION TO STRIKE
In this case, the plaintiff has made a claim against the Town of Waterford and several individual teachers and administrators of Waterford High School relating to an alleged assault upon the plaintiff which occurred at the school in 1996. The defendants may be divided into two categories; one category of defendants are the actual assailants who allegedly assaulted the plaintiff in 1996. The other category of defendants may be denominated as the school defendants and they include the Town of Waterford, the Waterford Board of Education, the Superintendent of Schools, as well as the Principal, Vice Principal, Director of Special Services, Freshman Football Coach, Assistant Freshman Football Coach and Acting Athletic Director of Waterford High School.
The complaint alleges that the plaintiff, a special education student at Waterford High School, joined the Freshman football team. Several students, including the three students who later allegedly assaulted him, had taunted, harassed and threatened the plaintiff on numerous occasions according to the allegations of the complaint. Both the school defendants and the parents of these youths were well-aware of the behavior of the three student assailants. The plaintiff's parents complained to the coach and assistant coach, to the athletic director, to the principal and vice principal about specific threats of physical injury which the three student assailants made to the plaintiff. The complaint alleges that none of these school officials took any action whatsoever in response to the complaints. Finally, on September 16, 1996, the complaint alleges that the three student assailants attacked the plaintiff in a hallway of the school causing him injury.
The defendants, Town of Waterford, Waterford Board of Education and the various school officials which the court has characterized as the school defendants have now filed motions to strike against the first, second, CT Page 3601 third and eighth counts of the complaint. The first count of the complaint alleges negligence against the Waterford Board of Education, the second count alleges negligence against the seven individual school defendants, the third count alleges negligence against the Town of Waterford based on the Town's obligation under § 7-465 of the General Statutes to indemnify employees of the Board of Education for negligence and violation of civil rights. The eighth count of the complaint alleges a violation of civil rights of the plaintiff by the seven individual school defendants.
 I
As indicated, the first and second counts are claims based on negligence against the Waterford Board of Education and individual school officials. Paragraph 46 of each count details the specifications of negligence which the court will now set forth:
First Count
46. Plaintiff's injuries, physical and emotional pain and suffering, were caused by the carelessness and negligence of the defendant Waterford Board of Education, by and through its agents and employees, in one or more of the following respects:
a. It failed to address complaints by plaintiff's family that plaintiff was being threatened and subjected to violence by a few identifiable students within the Waterford High School;
b. It failed to arrange for supervision of the plaintiff at times when he was not in class or otherwise in a supervised school activity to ensure that threats and/or assaults did not occur in school or during organized school events occurring after normal school hours;
c. It failed to intervene when threats and violence occurred in the presence of school staff;
d. It failed to identify and provide accommodations to plaintiff's disabilities such that he would not be disciplined for disability-related behavior;
e. It violated its duty to direct the staff at Waterford high School by rule or otherwise so as to afford reasonable safeguards to plaintiff;
f. It failed to take appropriate action following the assault by defendants Rivera, Ramirez and Ramus to ensure that plaintiff was not subjected to continued threats and violence by a few identifiable CT Page 3602 students following the September 13, 1996 assault;
g. It failed to arrange and direct Board employees by policy or otherwise so as to provide reasonable care and safeguards to plaintiff;
h. It failed to consider and take appropriate action based on the advice and recommendations of treating professionals retained by plaintiff's family;
i. It failed to provide and/or arrange for proper treatment so as to minimize and/or remediate the impact of threats and assaults by certain students on plaintiff;
j. It failed to ensure prompt and adequate treatment following the incident on September 13, 1996 (sic)[1] in which plaintiff suffered a broken nose, a concussion and emotional trauma;
k. It failed to take reasonable steps to supervise and/or control the five students identified by plaintiff and his family as threatening to injure him.
Second Count
46. Plaintiff's injuries and physical and emotional pain and suffering were caused by the carelessness and negligence of the defendants Randall Collins, Ph.D., Michael Granier, Barbara Birch, Michael Lovetere, Albert Moran, Richard Sylvia and Richard Little, in one or more of the following respects:
a. They failed to address complaints of plaintiff's family that plaintiff was being threatened and subjected to violence by a few identifiable students within the Waterford High School;
b. They failed to supervise plaintiff or arrange for adequate supervision of plaintiff when he was not in class or otherwise in a supervised school activity even though they knew or should have known of the risk posed by the conduct of these other students;
c. They failed to intervene when violence and threats of violence occurred presence of school employees;
d. They failed to identify and provide accommodations to plaintiff's disabilities so that he would not be disciplined for disability-related behavior;
e. They failed to report complaints that plaintiff was being threatened CT Page 3603 and subjected to attacks by a few identifiable students;
f. The defendants Collins, Granier, Birch, Lovetere and Moran violated their duty to arrange and direct the staff at Waterford High School by rule or otherwise to afford reasonable safeguards to plaintiff;
g. They failed to take appropriate action following the assault by defendants Rivera, Ramirez and Ramus to ensure that plaintiffs was not subjected to further threats and violence by a few identifiable students at Waterford high School;
h. The defendants Collins, Granier, Birch, Lovetere and Moran failed to arrange and direct Board employees by policy or otherwise, so as to afford reasonable care and safeguards to plaintiff;
i. They failed to consider and take appropriate action based on the advice and recommendations of treating professionals retained by plaintiff's family;
j. They failed to provide and/or arrange for proper treatment for plaintiff so as to minimize and remediate the impact on plaintiff of threats and violence by a few identifiable students;
k. They failed to ensure prompt and adequate treatment following the incident on September 13, 1996 (sic) in which plaintiff suffered a broken nose, a concussion and emotion (sic) trauma;
l. They failed to take reasonable steps to control the few students identified by plaintiff's as having threatened to assault him.
In the motion to strike, the defendants claim that the negligence allegations are essentially claims for educational malpractice and Connecticut does not recognize such a cause of action. The defendants cite the case of Gupta v. New Britain General Hospital, 239 Conn. 574,593 (1996) and Vogel v. Maimonides Academy of Western Connecticut, Inc.,58 Conn. App. 624, 628 (2000). The defendants allege that labeling these counts as actions lying in negligence, will not permit the plaintiff to avoid the holding in Gupta. In Gutpa itself, a contract claim characterized by the court as in reality an educational malpractice claim was before the court and as to this claim summary judgment was affirmed by the Gutpa court. The court is not persuaded by the defendants' argument and relies on the plaintiff's reference to the recent case ofDoe v. Yale University, 252 Conn. 641 (2000). In that case, our court articulated the distinction between educational malpractice which is not actionable and negligence by an educational institution which is actionable, see Kirschner v. Yale University, 150 Conn. 623 (1963). CT Page 3604 Plaintiff makes reference to two quotes from the case of Doe v. Yale University which the court believes support the plaintiff's position. At250 Conn. p. 659, the court says: "we recognize that, at first blush, the distinction between an educational malpractice claim, rejected in Gutpa, and a cognizable negligence claim arising in the educational context, permitted in Kirschner, may not always be clear. We conclude, however, that the distinction lies in the duty that is alleged to have been breached. If the duty alleged to have been breached is the duty to educate effectively, the claim is not cognizable. Gutpa v. New BritainGeneral Hospital, supra, 239 Conn. 593-94. If the duty alleged to have been breached is the common law duty not to cause physical injury by negligent conduct, such a claim is, of course, cognizable. That common law duty does not disappear when the negligent conduct occurs in an educational setting. This principle underlies this court's decision inKirschner." The court at page 663 went on to say "what tips the balance here, however, and what distinguishes this case from Gutpa is the result of the claimed educational inadequacy. When the claimed result is an inadequate education, there is no viable claim because we are unwilling to recognize such a legal duty as a matter of public policy. . . . when, however, the result is physical harm, as in the present case, we are willing to recognize the claim because it falls within the traditionally recognized duty not to cause physical harm by negligent conduct. The fact that harm is caused in an educational setting is not sufficient to remove the claim from that traditionally cognizable claim. Similarly, the fact that some of the allegations that support a claim of a failure of a defendants' duty not to cause physical injury in the course of instruction may mirror some of those that would be alleged that would support a malpractice claim, does not require the conclusion that the cause of action is one sounding in educational malpractice." In this case a cursory review of the complaint indicates that the allegations here do not raise issues of educational policy but relate directly to violence against the plaintiff and failure to protect him from that violence and the alleged failure of the individual school defendants to take action after the alleged assault to reduce the injuries suffered as a result of the assault. Three cases relied on by the Gutpa court to reject the viability of an educational malpractice claim in Connecticut are instructive and further underline the distinction between a claim of educational malpractice and one in which it is alleged that a student suffered physical harm due to the negligence of school officials. InDonohue v. Copiaque Union Free School, 391 N.E.2d 1352 (N.Y., 1979), the court noted at page 1353 that: "the thrust of appellant's claim is that notwithstanding his receipt of a certificate of graduation he lacks even the rudimentary ability to comprehend written English on a level sufficient to enable him to complete applications for employment." At page 1354, in rejecting a cause of action for educational malpractice, the court said that if we accepted such a theory of liability it would CT Page 3605 require the courts to "make judgments as to the validity of broad educational policies. . . . but more importantly, to sit in review of the day to day implementation of these policies." In Cavaliere v. Duff'sBusiness Institute, 605 A.2d 397 (Pa., 1992), the court had before it a case where the defendant, Institute, was alleged to have failed to provide adequate and quality instruction and proper instructional tools to the plaintiff. The complaint also questioned the qualifications of a replacement instructor provided by the Institute after the original teacher left. The plaintiff had gone to the institute to learn court reporting. At page 403, the court said the following: "this court would be hard-pressed to determine which of several alternative methods of teaching court reporting, or auto repair, or any other specialized business or trade or skill was the appropriate one. Nor would it be an easy task to determine why a particular student failed to acquire certain skills after pursuing a course of instruction aimed at teaching those skills." For these reasons the court rejected what was essentially an educational malpractice claim. The Gutpa court also cited the case ofRoss v. Creighton Univeristy, 740 F. Sup. 1319 (N.D., Ill., 1990). In that case, the court rejected a contract claim based on an allegation of inadequate educational services. In Ross at page 414, the court advanced several reasons why claims for educational malpractice should not be allowed. The court said: "first, there is a lack of a satisfactory standard of care by which to evaluate an educator . . . theories of education are not uniform, and different but acceptable scientific methods of academic training make it unfeasible to formulate a standard by which to judge the conduct of those delivering the services. . . . second, inherent uncertainties exist in this type of case about the cause and nature of damages. . . . factors such as a student's attitude, motivation, temperament, past experiences and home environment may all play an essential and immeasurable role in learning. . . . consequently, it may be a practical impossibility to prove that the alleged malpractice of the teacher approximately caused the learning deficiency of the plaintiff student." The Gutpa court quotes from page 416 of Ross where that court said: "where the essence of the complaint is that an educational institution breached its agreement by failing to provide an effective education, the court is . . . asked to evaluate the course of instruction and call upon to review the soundness the method of teaching that has been adoptive by that educational institution." That task theGutpa court in the case decided by it refused to perform. In this case, giving the allegations of the first and second count, every favorable inference, Amodio v. Cunningham, 182 Conn. 80, 82 (1 980) or even reading the complaint in a straight forward manner, it is clear that this complaint does not raise questions, for example, about the educational modality used by the school defendants to teach the plaintiff various subjects for which he attended Waterford high School. The complaint simply alleges that the school defendants failed to take steps to CT Page 3606 physically protect the student from assault by others despite warnings that he might be the victim of an assault and further alleges that after the assault, that school officials failed to provide him with the necessary care to prevent his physical injuries from being aggravated. To determine whether these allegations are true or not true, a common law jury or judge will not have to immerse itself in technical questions about the propriety of various educational theories of teaching or the ways in which teaching modalities were provided to students. What will have to be decided is whether the school defendants had an obligation to protect this plaintiff from physical violence and if so, whether they fulfilled their responsibilities in that regard in an adequate manner. To paraphrase the Ross case, any court hearing this complaint and its allegations will not have to involve itself in intricate theories of education or methods of academic training. What it will have to decide is whether, if there was a duty to protect the student, what common sense steps should have been taken to protect that student. For all of the foregoing reasons, the court will not strike the first and second counts.
 II
Since the court has not stricken the second count, the court will also not strike the third count which sets forth an indemnification claim under § 7-465 of the Connecticut General Statutes arising out of the allegations against the individual school defendants in the second count.
 III
As indicated the defendant's motion to strike is also directed against the eighth count which is based on a claim of violation of civil rights and is based on three contentions. First, the individual school defendants claim that they may not be sued in their official capacity. Secondly, they claim that they had no constitutional duty to protect the plaintiff from other students. And finally they claim, that no cause of action is alleged under 20 U.S.C. § 1415 in such a ways to give rise to a 1983 claim.
 (a)
In arguing that the individual school defendants in this case may not be sued in their individual capacity, the defendants say that stateofficials acting in their official capacities are not "persons" within the meaning of § 1983, therefore, they cannot be sued under the Civil Rights Act. As so stated, this is certainly the law; as indicated inSpencer v. Doe, 139 F.3d 107 (C.A.2, 1998) "neither a state nor one of CT Page 3607 its agencies nor an official of that agency sued in his or her official capacity is a person under § 1983." The court cites the Supreme Court case of Hafer v. Melow, 502 U.S. 21, 26 (1991). All of this is so because the Eleventh Amendment of the Federal Constitution immunizes state officials sued for damages in their individual capacities. In other words, a judgment against a public official in his official capacity imposes liability on the entity he or she represents and this is impermissible under the Eleventh Amendment. Kentucky v. Graham,473 U.S. 159, 169 (1985).
But the individual school defendants in this case are not state officials as such, but municipal officers and employees of the Board of Education. McQuillin notes that "the Federal Civil Rights Act provides a remedy for the violation of a person's constitutionally protected rights by any person acting under the color of state law. Therefore, when a municipal employee commits a constitutionally impermissible tort, he or she may be found liable so long as the employee is acting in his or her official capacity." Municipal Corporations, 3rd Ed., Vol. 4, § 12.210.10, p. 173. In § 46.09.10 in Vol. 16b at page 129, McQuillin
discusses the issue of back pay claims against school boards and notes the following: "a school board is a "person" within the intendment of42 U.S.C. § 1983, and can be sued directly under that section for monetary, declaratory, or injunctive relief. Whether an award of back pay against the school board is barred by the Eleventh Amendment depends on whether the Board constitutes an arm of the state partaking of the state's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which theEleventh Amendment is not applicable. Where a school board, as an entity, is essentially local in character, is locally controlled and the funds to defray a back pay award would not be derived primarily from the State Treasury, it is deemed to be an autonomous political subdivision rather than an alter ego of the state and the Eleventh Amendment
is no bar to the award."
Turning to the allegations in the eighth count of this complaint, it is true as the plaintiff notes that a local school board may be "an agent of the state for some purposes and an agent of the municipality for others," for purposes of Connecticut negligence law, Heigl v. Board of Education,218 Conn. 1, 3 (1991), and arguably for purposes of § 1983 analysis. However, when a motion to strike is filed the court is obligated to give the complaint every reasonable inference, Amodio v. Cunningham,182 Conn. 80, 82 (1980). On the face of this complaint this is simply a case where claims are made against a municipality and its officials; there are no allegations which enable the court to decide whether or not, given the factors mentioned by McQuillan, the school board in this case is an agent of the state for the purposes of § 1983 analysis. It CT Page 3608 would seem to make some sense to plead an immunity such as anEleventh Amendment defense as a special defense and if the defendants believe they are entitled to that defense the matter can be dealt with by way of a motion for summary judgment. But what McQuillin andMonel v. New York City Dept. of Social Serices, 436 USGS 8, 690 (1985) make clear is that there is no "blanket immunity" for municipal
officials who are not state agents and are members of local school boards.
The court will now discuss the claim made by the defendants that the eighth count is not viable since, even though in the appropriate case they could be subject to § 1983 liability, in this case the school defendants had no constitutional duty under the due process clause to protect the plaintiff from other students.
 (b)
The plaintiff's brief contains a good summary of the law in this area and the court has also relied on the leading treatise, Civil Rights and Civil Liberties Litigation: The Law of § 1983, Nahmod, Vol. 1, chapter 3, §§ 3.1, et sec. There is a great welter of opinions in this area; every federal circuit seems to have a different spin or point of emphasis or way of interpreting new Federal Supreme Court cases as they are delivered from on high which is not surprising since on crucial issues under § 1983 there are deep divisions in the Supreme Court. As counsel for the plaintiff notes in an important case like Albright v.Oliver, 510 U.S. 266 (1994) Justice Renquist wrote the majority opinion while five other justices contributed their wisdom. In County ofSacramento v. Lewis, 523 U.S. 833 (1998), the court held that substantive due process is not violated when a police officer causes death in a high speed chase because of deliberate or reckless indifference to human life. Id., 852; "a shocks the conscience" test must be applied — a much higher standard which requires the officer to have a purpose to do harm. Id., 854. There were no less than six concurring opinions and Nahmod expresses the comforting thought that "despite County of Sacramento the deliberate indifference standard for other § 1983 substantive due process cases survives for the time being." § 3.51, p. 3-113. In any event, certain basic criteria can be agreed upon. As Justice Renquist says in Albright v. Oliver: "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."510 U.S., p. 272.
In other words, the first requirement of a § 1983 allegation is that the substantive due process claim must relate to an interest considered worthy of constitutional protection — that would not include, for example, a claim based on the fact the guards only gave you CT Page 3609 Jell-O in cell block C, while cell block D got ice cream. But certainly, bodily integrity is worthy of constitutional protection and in paragraph 53 of count eight substantial violations of bodily integrity are alleged, including a broken nose, major depression, and post-traumatic stress disorder.
But that is only the first step in a § 1983 claim. The plaintiff must further allege and later prove with regard to any such injury, that the defendant owed a constitutional duty to the plaintiff and, then, that that duty was breached.
For the purposes of the issues before the court, the controlling case is DeShaney v. Winabego County Social Services Department, 489 U.S. 189
(1989). In that case, the County Department of Social Services received several complaints that the petitioner child was being abused by his father. The department took various steps to protect the child but did not remove him from the father's custody. Finally the father beat the child so severely that the child suffered extensive brain damage. The child and his mother then brought suit against the department and several county social workers. The Supreme Court held that the failure to provide the child with adequate protection against the father's violence did not violate the child's right to substantive due process.
Justice Rehnquist delivered the court's opinion which expanded on and gave reasons for the just-mentioned holding. Also contained within the opinion are the two recognized exceptions to the DeShaney rule which the various federal circuits have been busy refining and trying to interpret over the last decade; the cases are collected in Volume 1 of Professor Nahmod's work at § 3.60, pp. 3-159 to 3-181.
The general rule and the reasons for it are set forth at page 196 of theDeShaney opinion where the court says:
 ". . . cases have recognized that the due process clause generally confers no affirmative right to government aid, even when such aid may be necessary to secure life, liberty, or property interests, of which the government may not deprive the individual. . . . if the due process clause does not require the state to provide its citizens with particular protective services, it follows that the state cannot be held liable under that clause for injuries that could have been averted had it chosen to provide them. As a general matter, then, we conclude that a state's failure to protect an individual against private violence simply does not constitute a violation of the CT Page 3610 due process clause."
The court goes on to discuss other claims made by the petitioner and in the course of that discussion in effect recognizes two interrelated exceptions to this just described DeShaney rule. The first exception is the so-called "special relationship exception." The court introduces the discussion of this exception on page 198 by using restrictive language which is used at other points in the opinion when it talks of this exception. The court says that: "It is true that in certain limited circumstances the Constitution imposes upon the state affirmative duties of care and protection with respect to particular individuals." The court then cites as examples cases involving incarcerated prisoners and involuntarily committed mental patients. At page 199, returning to the case before it, the court says: "But these cases afford the petitioner no help. Taken together they stand for the proposition that when the state takes a person into its custody and hold him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." Nahmod appreciates the restrictive import of this language, saying at § 3.60 pp. 3-160-61: "After DeShaney, then, it is possible that despite the existence of considerable judicial reluctance to find such special relationships, there will be cases with egregious fact situations where such special relationships will be found. However, this possibility should not be overstated. Perhaps significantly the Supreme Court inDavidson v. Cannon, 474 U.S. 344 (1986) refused to find the special relationship even though both the plaintiff inmate and his assailant were in government custody and thus under government control."
Relying of the restrictive language in DeShaney, several courts have held no special relationship existed in the school setting so as to permit § 1983 actions against school boards and officials who fail to protect students from other students. The defendant has referred to cases such as D.R. v. Middle Bucks Area Vocational Technical School,972 F.2d 1364, 1373 (C.A. 3, 1992); Walton v. Alexander, 44 F.3d 1297
(C.A. 5 1995); Graham v. Independent School District No. I-89, 22 F.3d 991
(C.A. 10 1994); Dorothy J. v. Little Rock School District, 7 F.3d 729
(C.A. 8, 1993). Also see, Stevens v. Umsted, 131 F.3d 697 (C.A. 7, 1997); Sutton v. Utah State School for Deaf and Blind, 173 F.3d 1226
(C.A. 10, 1999); Seamons v. Snow, 84 F.3d 1226 (C.A. 10, 1996). In D.R.v. Middle Bucks, supra, the court refused to find an analogy between school attendance and confinement by the state in a jail or a mental institution; the court in Dorothy J. v. Little Rock School District, supra, the reasoned that mandated school attendance did not elevate the circumstances before it to that type of custody referred to in DeShaney
which was necessary to create a special relationship for § 1983 purposes. However, certain language in DeShaney has encouraged some CT Page 3611 courts apparently to give a more liberal or relaxed view to the special relationship test. For example, at page 200 the court said that: The affirmative duty to protect arises not from the state's knowledge of the individual's predicament or from its expression of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." And in an odd analogy, given its strict comments on what state custody should mean in order to give rise to the special relationship exception, the court at footnote 9 of its opinion said had the state, for example, used its power to remove the child from free society "and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." Some courts, relying on the foregoing language, have found that school officials do have an affirmative duty to protect students from other students and rely on what they feel is a custodial analogy to incarceration and institutionalization created by the fact that students are required to attend school. Lichtler v. County of Orange,813 F. Sup. 1054, 1056 (S.D.N.Y., 1993); Pagano v. Massapequa PublicSchools, 714 F. Sup. 641, 643 (E.D.N.Y., 1989). This is a comparison that I am sure children would understand and appreciate but a review of the cases decided by Nahmod in footnote 11 at pages 3-163, et seq. support his observation that "there is considerable judicial reluctance to find such special relationship," id., p. 3-160 — this is not surprising given the strict language of DeShaney which has been referred to by the court.
But there is a second exception to the DeShaney rule suggested by the court and assumed in the cases and by commentators like Nahmod. See § 3.60 of Vol. 1. At page 201 of DeShaney, the court says the following: "Petitioners concede that the harm Joshua suffered occurred not while he was in the state's custody, but while he was in the custody of his natural father who was in no sense a state actor. While the state may have been aware of the dangers that Joshua faced in the free world itplayed no part in their creation, nor did it do anything to render himany more vulnerable to them." This emphasized language, in effect, sets forth the parameters of the so-called "state created danger exception." See case extensively quoted from in plaintiff's brief which comments on this exception, Citizens Accord, Inc. v. Town of Rochester,2000 U.S. Dist. Lexis 4844 (N.D.N.Y., 2000). There is an interesting dichotomy suggested in the state created danger language just quoted fromDeShaney. There is obviously a state created danger when a state official, for example, inflicts or encourages or incites the danger or the conditions causing the danger. But there may be situations as to which the exception applies where the state played no part in the creation of the danger but somehow made the injured party "more vulnerable" to the danger. CT Page 3612
The court will now review the viability of the allegations of the eighth count of the complaint in light of the foregoing discussion of theDeShaney rule and the two exceptions to that rule.
Based on the strict interpretation the Supreme Court has given to the special relationship exception to DeShaney and on the posture taken by the Fifth Circuit in the case of Doe v. Taylor Independent School District,15 F.3d 443 (1 994) which the court will discuss more fully later in this opinion, the court is reluctant to hold that the special relationship exception to DeShaney applies. The court will concentrate on the second exception — state created danger — and its cousin the deliberate indifference rule.
In this regard, the court will first address what might be considered a technical problem with the motion to strike. The eighth count makes allegations against several so-called school defendants. One of the school defendants is Albert Moran who is a freshman football coach at the high school, another school defendant is Richard Sylvia, who is the assistant coach of the Freshman football team. A defendant named Ramirez is alleged in the complaint to be one of the students who attacked the plaintiff on September 16, 1996. Several paragraphs have characterized Ramirez's behavior. He had threatened the plaintiff from the day school began and the threats built over from football practice to the educational program, paragraphs 20 and 21. Paragraph 25 alleges that a few days before the actual attack on the plaintiff, he was told by members of the football team that Ramirez and two others had planned to beat him up. The plaintiff left school because of the threats and his sister complained to the defendants Moran and Sylvia about the threats and violence directed towards her brother during the practice on that particular day, September 13. The paragraph goes on to allege that Moran and Sylvia responded that nothing could be done and then the paragraph states "indeed, upon information believed defendants Moran and Sylvia encouraged defendant Ramirez to continue his behavior towards plaintiff to "toughen up plaintiff." The last sentence could have benefitted from a request to revise but no such request was filed. Therefore, the court must accept this allegation as it stands and given the characterization of Ramirez's behavior and the claim that these two school defendants knew of the nature of that behavior it can certainly be inferred that their encouragement of Ramirez to continue his activities was a factor leading to the ultimate assault on the plaintiff. This type of activity would certainly seem to fall under the second exception to the DeShaney
rule where violation of substantive due process can be found if municipal officials create a situation of danger for the plaintiff. In this regard, the case of Dwares v. City of New York, 985 F.2d 94, 99 (C.A. 2, 1993) is "of some interest. In that case, the Second Circuit CT Page 3613 distinguished DeShaney from the case before it. The allegations made inDwares were that the defendant police officers conspired with skin heads to permit them to beat up flag burners. It was further alleged that the police assured these skin heads that unless they got totally out of control they would not be arrested or prevented from continuing their activities. The court reasoned "such prior assurances would have increased the likelihood that the skin heads would assault demonstrators." Thus the court reasoned that the plaintiff in effect alleged that the defendant police officers aided and abetted in the deprivation of the plaintiff's constitutional rights by permitting him to be subjected to a prolonged assault in their presence. Here there is no allegation that the assault occurred in the presence of the school officials, but like Dwares, the inference can be drawn from the "toughen up" allegations of the complaint that the actions of Moran and Sylvia encouraged activity which led to the eventual assault. Therefore, the court concludes that there is a viable § 1983 claim made against defendants Moran and Sylvia. The technical problem presented by the motion to strike, however, is that Moran and Sylvia are not the only school defendants referred to in paragraph eight. Even if the court were to conclude that § 1983 allegations against the other school defendants referred to in paragraph eight were not viable it could not grant the motion to strike. The traditional common law rule was that when a motion to strike is directed against the entire complaint it cannot be granted if particular counts are legally sufficient; also a motion to strike cannot be used to question the viability of particular paragraphs of a count when the viability of the whole count is not thereby bought into question, see Doyal v. AP Realty, 36 Conn. Sup. 126 (1980); Cantoniv. Xerox Corp., 24 Conn.L.Rptr. 103 (1999); compare cf. Water Commionersv. Robbins, 82 Conn. 623, 633 (1910). The foregoing provides sufficient reason to deny the motion to strike, however, the court will discuss the viability of the claims made at least against some of the other school defendants referred to in the eighth count since, as to most of them, there appears to be separate grounds to conclude that a prima facie case of a violation of substantive due process has been set forth in the complaint.
Several school defendants besides Moran and Sylvia are made defendants in the eighth count. The nineteenth paragraph alleges that the defendant Collins, who was the school superintendent, the defendant Grainier, who was principal of the high school, the defendant Birch, who was the vice-principal, the defendant Lovetere, who was responsible for special services at the school and the defendant Little, who was the acting athletic director "`were aware of the propensity of the defendants Rivera, Ramirez and Ramos to become involved in conflicts with other students." These three individuals are student defendants in this case. The plaintiff's mother complained to Little about the ongoing violence CT Page 3614 and threats directed towards her son on September 11, 1996. Mr. Little said that he would look into the matter but "upon information and belief" Little took no action (par. 24). Paragraph 29 alleges that on September 16, the plaintiff's mother had a meeting with the defendant Birch in which she told Birch that five students including Ramirez, Ramos and Rivera had threatened the plaintiff and that violence had been directed against him. She told Ms. Birch that she had repeatedly complained to school personnel but that nothing had been done to address the problem. The paragraph goes on to allege that Birch told the mother that she would investigate the complaints immediately. Paragraph 30 then states that later that morning, Ramirez, Rivera and Ramos attacked the plaintiff, pushing his head into lockers, punching him in the nose and causing the injury which is the subject of this complaint.
As previously indicated in the discussion of the eighth count's allegations, the threats and violence grew out of the plaintiff's involvement in the football program. The inference can be drawn from the complaint that athletic director Little, principal Grainier and vice-principal Birch had a supervisory power over Moran and Sylvia and their football program or at least the ability to do something about the complaints being made regarding Ramirez and the other youths who threatened and eventually attacked the plaintiff.
What is the ambit of liability for supervisory personnel in § 1983 litigation? Monell v. Department of Social Services, 436 U.S. 658 (1978) made clear that the doctrine of respondeat's superior in tort law does not apply in the § 1983 context. As the court said: "`the fact the Congress did specifically provide that A's tort became B's liability if B used A to subject another to a tort suggests that Congress did not intend that § 1983 liability to attach where such causation was absent." Id., 692. Nahmod states that what is "currently required" for a superior to have a § 1983 duty is that "the superior must possess either the state of mind for the particular constitutional violation or deliberate indifference, and must also have played a causal role in plaintiff's constitutional violation." Vol. 1 at p. 3-247. But where we are at in the presence state of § 1983 litigation cannot be so nicely defined by a neat turn of phrase. As Nahmod surprisingly says, at pp. 3-251 and 3-252 that:
 "There are circumstances in which a supervisor or other superior may be individually liable under § 1983 to third persons in connection with the conduct of subordinates even though respondeat superior is not applicable. What is required for such liability the Supreme Court has indicated, is personal involvement of the superior in the unconstitutional conduct of CT Page 3615 subordinates. However, it has never been entirely clear what that means." (Emphasis added.)
There are two possible paths out of this wilderness which might lead to some insights of the viability of § 1983 claims against the supervisory personnel in this case. Nahmod refers to what he characterizes as "an important public school student sexual molestation case" the case is Doe v. Taylor Independent School District, 975 F.2d 137
(C.A. 5, 1994). There, a teacher had been sexually molesting a child. A panel of the Fifth Circuit Court of Appeals said that the defendant school district had an affirmative constitutional duty to protect the child and that by reason of compulsory education "the state cultivates a special relationship with (a child) and thus owes (the child) an affirmative duty of protection." Id., 147. The Fifth Circuit Court in en banc vacated this opinion in 15 F.3d 443 (C.A. 5, 1994). In that opinion the court held that deliberate indifference was the appropriate standard for supervisory liability not the special relationship exception. The court said at 15 F.3d at p. 454:
 "A supervisory school official can be held personally liable for a subordinate's violation of an elementary or secondary school students of constitutional right to bodily integrity and physical sexual abuse cases if the plaintiff establishes that: 1) the defendant learned the facts or a pattern of inappropriate sexual behavior by a subordinate for sexually abusing the student; 2) the defendant demonstrated deliberate indifference towards the constitutional rights of the student by failing to take action that was obviously necessary to prevent or stop the abuse; and 3) such failure caused a constitutional injury to the student."
The complaint here in effect alleges that all the supervisory personnel knew of the violent propensities of Ramirez and his cohorts (par. 19). The plaintiff's mother complained to Mr. Little about the threats and violence directed against her son by Ramos, Rivera and Ramirez five days before the actual assault and goes on to allege that Mr. Little took no action in regard to these complaints (par. 24). The day of the assault, the plaintiff and his mother met with the vice-principal, Birch, and informed her of the ongoing threats and violence and the fact that no action had been taken to address the problem. Birch said that the plaintiff would not be disciplined for missing school three days before in the face of these threats and that "she would investigate these complaints immediately," (par. 30). Inferentially she did not do so immediately enough since the plaintiff was beaten up after the meeting. CT Page 3616 Following the reasoning of the Fifth Circuit in the Doe v. TaylorIndependent School District case, the court believes that deliberate indifference standard should apply. The court cannot ascertain any readily apparent reason why the deliberate indifference standard should apply in the case of a situation where a teacher was for example molesting a student but not apply to a case where other students were threatening and inflicting violence on another student. This is especially so in a case where student who attacked the injured student was allegedly well-known to the supervisory personnel. Thus, the court concludes that the state created danger exception, as filtered through the deliberate indifference standard, would be sufficient, given the allegations of this complaint, to permit a viable § 1983 claim certainly against the supervisory school defendants Little and Birch.
What about the school defendants Collins, the school superintendent, who by the nature of his job would have supervisory responsibilities?
The court in Taylor Independent School District case relied on the Supreme Court case of City of Canton, Ohio v. Harris, 489 U.S. 378
(1989). The circumstances of that case and its reasoning gives a slightly different perspective to the type of problem before the court regarding supervisory personnel which may indeed provide a separate basis for the court to conclude a viable § 1983 claim can be made against the defendant supervisory personnel here including the defendant Collins who is the superintendent of the school system and the school defendant Granier, who is the principal. The City of Canton case held that "the inadequacy of police training may serve as a basis of § 1983 liability . . . where the failure to train amounts to deliberate indifference of the rights of persons with whom the police come into contact," 489 U.S., at ___. It is not too far a step from City ofCanton to say that in an atmosphere of increasing school violence school superintendents, principals and other supervisory personnel have a responsibility to formulate effective procedures to receive complaints where student on student threats and violence known to be occurring and to establish guidelines which set forth how various school programs including athletic programs should be conducted. Principals, vice-principals and athletic directors have the responsibility in some situations to formulate those guidelines but also to implement policies established at a higher level in the school bureaucracy. It can be inferred here that the procedure for receiving and handling complaints and the supervisory function regarding how those complaints were dealt with within the school system was ineffective at this school either because no guidelines had been established or they were not being complied with. Such an allegation may not withstand summery judgment scrutiny but the court cannot say that, given the allegations of this complaint the most favorable inference, there has not been a viable CT Page 3617 § 1983 claim asserted against the supervisory personnel in this case school defendants in this case who had supervisory responsibility.[2]
 (c)
The court will not address that aspect of the motion to strike that in effect argues that a § 1983 violation cannot be based on a violation of 20 U.S.C. § 1400, et seq (The Disabilities Education Act). Since the court concludes the count is legally sufficient in asserting a substantive due process claim under § 1983, the motion to strike could not be granted even if the court were to agree with the defendants' position as to 20 U.S.C. § 1415.
In any event, the motion to strike is denied.
Corradino, J.